Filed 8/4/22  In re Milam CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re<br><br>THOMAS JASON MILAM<br><br>on<br><br>Habeas Corpus. | B312401<br><br>(Los Angeles County<br>Super. Ct. No. NA055388) |

Petition for writ of habeas corpus from the judgment of the Superior Court of Los Angeles County, Judith Levey Meyer, Judge.  Petition granted.

Cuauhtemoc Ortega, Federal Public Defender, Michael T. Drake and Raj N. Shah, Deputy Federal Public Defenders, for Petitioner.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill, Thomas C. Hsieh, Dana M. Ali, Idan Ivri and Shira Seigle Markovich, Deputy Attorneys General, for Respondent.

————————————

Petitioner Thomas Milam, codefendant Theodore Kelly and two other men robbed a pawnshop in Long Beach. One of the shop's employees triggered a silent alarm and Long Beach Police Department (LBPD) personnel arrived as Milam fled alone through the back door of the pawnshop. LBPD Sergeant Eric Hooker and LBPD Officer Raymond Panek pursued Milam. Milam fired multiple shots at Officers Hooker and Panek but did not hit them. Milam was charged with, but not convicted of, the attempted murders of those officers. Later in the same pursuit, Milam fired a single shot in the general direction of LBPD Detectives Victor Thrash and Hector Gutierrez and was charged with two counts of attempted murder of these detectives.[1] In closing argument, the prosecutor relied on the kill zone instruction to account for how Milam could have intended to kill two victims with one bullet. The jury convicted Milam of both attempted murder counts.

Broadly speaking, the kill zone theory provides that "a defendant may be convicted of the attempted murder of an individual who was not the defendant's primary target." (*People Canizales* (2019) 7 Cal.5th 591, 596 (*Canizales*).) After Milam was convicted, the California Supreme Court limited the application of the kill zone theory to situations where "(1) the circumstances of the defendant's attack on a primary target . . . are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target

---

[1] Milam alone was charged with these attempted murders.

2

was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Id.* at p. 607.)

The Supreme Court found CALCRIM No. 600, the then-standard jury instruction on the kill zone theory, deficient because it did not adequately define the term "kill zone" and did not adequately tell the jury to consider evidence "regarding the circumstances of defendants' attack when determining whether defendants 'intended to kill [the primary victim] by killing everyone in the kill zone.' " (*Canizales, supra,* 7 Cal.5th at p. 613.) The jury in this case was instructed on the kill zone theory with CALJIC No. 8.66.1, the predecessor kill zone instruction, which suffers from similar deficiencies.

After many procedural hurdles, including several proceedings in federal court, Milam filed a petition for writ of habeas corpus in Los Angeles County Superior Court, seeking reversal of the two attempted murder convictions due to the erroneous kill zone instruction and additional errors related to the kill zone theory. The superior court agreed the instruction was erroneous but concluded only one of the two attempted murder convictions had to be vacated as a result. The court found the evidence showed "Mr. Milam was shooting at Gutierrez, and the other officer [Thrash] was just around the corner, and that he would have been in the kill zone. But, clearly, Gutierrez was straight ahead in the line of sight." The court vacated the attempted murder conviction as to Thrash. This parallels the result in *Canizales*, where the Supreme Court upheld the attempted murder conviction as to the primary target

3

but reversed it as to the second victim who was merely in the kill zone.

Milam then brought a petition for writ of habeas corpus in this court, seeking reversal of the conviction involving Gutierrez.

A.    *Milam Is Not Estopped from Challenging the Gutierrez Conviction.*

Respondent contends in its informal response that Milam's counsel stated in the Superior Court that the relief he was seeking was either to pick one conviction and sustain it and vacate the other, or to vacate both and let the prosecutor decide whether to retry one of the counts.  At the end of the hearing, the trial court sustained the conviction as to Gutierrez and vacated the conviction as to Thrash.  Respondent contends that since Milam received the relief he was seeking, he should be estopped from seeking further relief.

The reporter's transcript reflects that Milam's counsel stated: "So like I said before, the remedy in that situation is: I'd prefer to pick one and then sustain it and then vacate the other one, or vacate both, and then allow the district attorney's office to decide whether it wants to retry one of the counts."  In his informal reply, Milam's counsel states that he believes he said the "remedy *isn't* to pick one conviction and sustain it and then vacate the other one, *but to* vacate both."  Counsel notes that the hearing took place via telephone and the transcript shows the court reporter had some difficulty transcribing his statements.

More significantly, the statement as transcribed refers to counsel's earlier statement ("like I said before").  Counsel began the hearing by noting that the district attorney's office was "conceding that one count should go away, and they're proposing that the court should choose."  Counsel continued: "They're

4

suggesting that it's for the—court to pick which one—which conviction should go away.  My position is that there's prejudice on both counts because there was no primary target specified." Counsel continued:  "So I think they both should be vacated, and then the DA should be left to decide whether it wants to retry one of them and decide which count it wants to retry."

Further, whether Milam's counsel was mistranscribed or he misspoke, the trial court clearly did not understand him as changing his position and agreeing to have only one conviction vacated.  The trial court stated to counsel:  "Mr. Drake, you clearly do your client a service with these arguments.  However, my opinion differs from yours, Mr. Drake."  The court then went on to explain that it was sustaining one conviction (Gutierrez) and vacating the other (Thrash).  Further, at the end of the hearing, the court asked Milam's counsel if he wanted the court to add a transcript of the hearing for him.  Counsel replied that he did, because "I might take it up on a writ." The court responded:  "Right.  That's why I'm asking."

Respondent does not argue that the People relied on Milam's counsel's alleged concession, perhaps because there is nothing in the record to support such a claim.  The trial court ruled immediately after the alleged concession.  As part of its ruling, the court indicated that it would dismiss count 4 (Thrash) unless it was "something that you want to try and retry?"  The prosecutor responded:  "I wasn't expecting that question, so no, at this point, we're conceding that there was an instructional error, and that count should not remain."  This is entirely consistent with the People's earlier briefing in the matter, in which the People conceded the facts of this case did not warrant the kill zone instruction after *Canizales*, and also stated that "as in

5

[*People v. Perez* (2010) 50 Cal.4th 222] and [*People v.* (2009) 46 Cal.4th 131 (*Stone*)] . . . firing a single shot at several people was one offense of attempted murder." There is nothing to suggest the prosecutor changed her position in reliance on counsel's supposed concession.

In its Return, respondent reincorporates the above claims, and adds that relief is not warranted because the superior court's decision to vacate the conviction for the attempted murder of Thrash "solved" the problem of two convictions based on a single shot. Respondent contends the jury necessarily found that Milam intended to kill at least one of the detectives, it would be inequitable to vacate the remaining conviction, and Milam should be estopped from seeking such relief. Milam is not estopped from claiming the remaining conviction is improper. That is the question this writ proceeding will decide.

B. *The Kill Zone Instruction Was Deficient Because It Failed to Identify a Primary Victim.*

In his petition, Milam alleges the kill zone instruction in this case suffered the same defects as the instruction used in *Canizales*, along with one additional defect. As in *Canizales*, the instruction in this case did not tell the jury that it could apply the kill zone theory only if it was the sole reasonable inference from the evidence, and it did not provide sufficient guidance on evaluating whether a kill zone existed (by listing factors such as the proximity of victims to each other). However, the instruction in this case also had another defect mentioned but not present in *Canizales*: the failure to identify a primary victim.

6

In its informal response, respondent argues the instruction was legally erroneous as to Thrash (because he was the kill zone victim and the kill zone theory did not apply), but only factually erroneous as to Gutierrez, "because the jury would not have applied the [kill zone] theory at all with respect to him." By this respondent simply means that the jury would not have found Gutierrez was the kill zone victim and so would not have relied on the kill zone theory to convict him. Put differently, respondent argues that the jury would have found Gutierrez was the primary target, and so would have convicted Milam of attempted murder based on his specific intent to kill Gutierrez. Respondent contends, at length, that the evidence overwhelmingly showed, and the prosecutor's arguments clearly told the jury, that Gutierrez was the primary target. We disagree.

In our order to show cause, we stated Milam had made out a prima facie case that the kill zone instruction used in this case was legally erroneous under *Canizales* in failing to either identify the primary target or provide guidance to the jury on determining which victim was the primary target. We also stated he had made out a prima facie case that it was not clear beyond a reasonable doubt that the jurors agreed unanimously that Gutierrez was the primary target, or that they would have so agreed if properly instructed. We asked the parties to brief (1) whether unanimity is required as to the identity of the primary victim; (2) whether other instructions or argument conveyed that requirement to the jury; and (3) whether the *Chapman*[2] standard of review applies to unanimity errors.

---

[2]     *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).

Although in their Informal Response the People had not contested that the kill zone required the identification of a primary target and agreement as to that target, in the Return they directly challenge the requirement to identify a primary target and contend unanimity was not required under the facts of this case. Respondent contends the error in this case was giving a factually unsupported instruction; therefore, the appropriate standard of review is *Watson*,[3] which is not satisfied by this case.

We now conclude that the kill zone instruction used in this case was legally erroneous under *Canizales* in failing to either identify the primary target or provide guidance to the jury on determining which victim was the primary target. We hold that under the facts of this case, unanimity was required as to the identity of the only (and thus primary) victim and this requirement was not conveyed to the jury by other instructions or argument. This deficiency alone requires review under the *Chapman* standard. Further, as a result of these deficiencies, we find that it is reasonably likely the jury understood the kill zone theory in an impermissible way, specifically that they could convict Milam of two counts of murder based on one shot and an intent to kill one person. This too requires review under the *Chapman* standard. We find it is not clear beyond a reasonable doubt that the jurors agreed unanimously that Gutierrez was the only (and thus primary) target, or that they would have so agreed if properly instructed.

---

[3]     *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

1. *The Kill Zone Theory Requires Identification of the Primary Target.*

Respondent contends the issue before the court is not whether a kill zone instruction requires identification of a specific primary victim because such an instruction should never have been given in this case. As we explain in more detail below, we view the issue of identification of a primary target as largely already decided. CALCRIM No. 600 directed the trial court to insert the names of the primary target and kill victim, and this direction is supported by case law. It is respondent who is trying to make new law, not this court.

Relying on *Stone*, respondent contends the offense of attempted murder does not require an identified victim. This is remarkably similar to the argument the Attorney General made in *Canizales*, which was rejected by the Supreme Court. The Supreme Court agreed *Stone* makes clear "there are other evidentiary bases, other than the kill zone theory, on which a fact finder can infer an intent to kill for purposes of attempted murder liability that do not depend on a showing that the defendant had a primary target (for example, when a terrorist places a bomb on a commercial airliner intending to kill as many people as possible without intending to kill a specific individual). [Citations.]" (*Canizales*, *supra*, 7 Cal.5th at p. 608) Milam also contends that under the circumstances of this case, the lack of an instruction on jury unanimity meant the jury was likely to have "mix and match" theories concerning which detective was the primary target.

"When the kill zone theory is used to support an inference that the defendant concurrently intended to kill a nontargeted victim, however, *evidence of a primary target is required*." (*Canizales, supra,* 7 Cal.5th at p. 608, italics added.)

The jury in *Canizales* was instructed on the kill zone theory with CALCRIM No. 600, which directed the court to identity both the primary target and the kill zone victims by name, and the instruction as given contained this information. Thus the Court in *Canizales* was not faced with a situation where the primary target was not identified in the jury instruction, and so did not discuss such a scenario. As Milam points out in his traverse, the reminder in *Canizales* that it is possible to convict a defendant of attempted murder without a specific identified victim under a *Stone* theory only underlines the need to identify the primary target in a kill zone case. As Division 1 of this District Court of Appeal put it: it is "[t]he absence of a specific target" which "distinguishes" a *Stone*-theory case from a kill zone theory case. (*People v. Foster* (2021) 61 Cal.App.5th 430, 441, fn. 16 (*Foster*).) As Division 1 also noted: "The two theories are mutually exclusive." (*Ibid.*) Or, as the First District Court of Appeal phrased it: "*Canizales* and *Stone* work hand-in-hand to clarify the kill zone theory and to describe liability for partially unsuccessful attempts at mass murder. *Stone* establishes that the kill zone theory cannot be used when the defendant fires indiscriminately at a crowd of people, not aiming to kill anyone in particular, but hoping to kill as many as possible. [Citation.] *Canizales* reinforces that the kill zone theory requires identification of an intended target." (*People v. Thompkins* (2020) 50 Cal.App.5th 365, 396, fn. 10 (*Thompkins*).)

Respondent also relies on a post-*Canizales* case, *In re Lisea* (2022) 73 Cal.App.5th 1041, to support its argument that no identification of the primary victim is required. This reliance, too, is misplaced. While respondent is correct that the court in *Lisea* found, in respondent's words, that "a modified instruction which failed to identify a primary target nevertheless constituted a kill zone instruction," that recognition does not constitute approval. The court in *Lisea* noted "the instruction does not list a primary target, a requirement for the kill zone instruction." (*Id.* at p. 1054.) The court also noted "the kill zone portion of the instruction in this case differs from . . . other kill zone instructions by not identifying a primary target." (*Id.* at p. 1055.)[4] Nothing in those statements, or any statement in the opinion, can be reasonably understood as approving the failure to identify a primary target within a kill zone instruction.

In another post-*Canizales* case, the First District Court of Appeal has more strongly indicated that the kill zone theory requires identification of the primary target, stating: "*Canizales reinforces that the kill zone theory requires identification of an intended target. (Canizales*, [*supra*, 7 Cal.5th] at pp. 607–608.)" (*Thompkins, supra,* 50 Cal.App.5th at p. 396, fn. 10, italics added.) Discussions in other post-*Canizales* cases support this requirement. As the Fourth District Court of Appeal held, "without a primary victim, the kill zone theory is categorically inapplicable." (*People v. Cardenas* (2020) 53 Cal.App.5th 102, 118.) And Division 1 explained: "The kill zone theory applies

---

[4] The instruction in effect treated a bystander as the intended target, telling the jury it had to find that the defendant not only intended to kill Smith (the bystander) but also intended to kill others "in the kill zone."

when the defendant chooses, as a means of killing a specific, targeted individual, to kill everyone in the area in which the targeted individual is located." (*Foster*, *supra*, 61 Cal.App.5th at p. 441, fn. 16.)

Respondent's reliance on CALJIC 8.66.1 to support its argument does not remedy the absence of case law authority. As respondent correctly observes, CALJIC 8.66.1 does not require a trial court to name the alleged primary target or non-target victim. However, CALCRIM 600 is the official instruction on the kill zone theory, having been adopted by the Judicial Council. CALCRIM 600 was also the instruction used and analyzed in *Canizales,* and it does direct the trial court to identify by name both the alleged primary target and the non-target victim.

2.  *The Prosecutor Did Not Elect a Primary Victim in Its Closing Argument.*

Finally, respondent argues that even if a kill zone instruction is required to identify the primary target by name, or to provide guidance to the jury on that factual issue, a prosecutor's argument specifying the victim the defendant intended to kill is sufficient to cure the deficiency.[5] Certainly, a failure to identify the primary target in the kill zone instruction

---

[5]  Respondent relies on *People v. Mumin* (2021) 68 Cal.App.5th 36, 57 to support this argument, but there is nothing in that opinion to indicate whether the kill zone instruction identified the primary target. The argument was about the sufficiency of the evidence. We note, as respondent does not, that review has been granted in *Mumin,* although it may still be cited for its persuasive value (and to show a conflict in authority on an issue not relevant to this proceeding.) (*Ibid.,* review granted Nov. 10, 2021, S271049.)

will be harmless under the circumstances of some cases, and the prosecutor's argument is a relevant circumstance which should be considered, although not necessarily the only one. Here, of course, Milam contends the prosecutor did not clearly specify the primary target, and there was a conflict in the evidence concerning where Milam aimed his gun. As discussed below in Section D2, the People did not identify a primary victim during trial or in closing argument nor did the evidence presented naturally lend itself to an identification of a primary victim. We cannot conclude that the prosecutor's argument, under these circumstances, cured the deficiency. The kill zone instruction failed to identify the primary victim and was insufficient under *Canizales*.

C.    *An Instruction on Unanimity As to the Identity of the Primary Target Was Required under the Facts of This Case.*

Milam also contends that under the circumstances of this case, the lack of an instruction on jury unanimity meant the jury was likely to have "mix and match" theories concerning which detective was the primary target.

When a kill zone instruction identifies the primary target and kill zone victims by name, an instruction on unanimity will almost certainly be superfluous. Thus we need not and do not address whether all kill zone instructions must tell the jury unanimity is required as to the identity of the primary victim. As we discuss below, however, a unanimity instruction was certainly required under the facts of this case.

Respondent contends this case does not involve the typical situation where a unanimity instruction is required, that is, where a defendant has committed multiple acts which constitute a single discrete crime. Milam agrees. Respondent acknowledges

13

this case also does not fall into a liability situation where unanimity as to the theory is not required.  In respondent's view, if the jury applied the kill zone theory, the issue is whether it was required to agree unanimously as to the identity of the primary target.  Milam agrees this case is not easily categorized for purposes of unanimity.

"'[E]ven absent a request, the court should give [a unanimity] instruction "where the circumstances of the case so dictate." '"  (*People v. Covarrubias* (2016) 1 Cal.5th 838, 877.) That is the case here.  Under the facts of this case, unanimity was required as to the identity of the only (and thus primary) victim.  "When a single act is charged as an attempt on the lives of two or more persons, the intent to kill element must be examined independently as to each alleged attempted murder victim; an intent to kill cannot be 'transferred' from one attempted murder victim to another under the transferred intent doctrine."  (*Canizales*, *supra*, 7 Cal.5th at p. 602, citing *People v. Bland* (2002) 28 Cal.4th 313, 327–328 (*Bland*).)  Further, the general rule is that unanimity is required as to the victim if there are multiple victims alleged, but only a single count of a crime is alleged.  *People v. McNeill* (1980) 112 Cal.App.3d 330, 335–336 ["The possibility that the jurors may have come to different conclusions as to the identity of the assault victim vitiates the constitutionally required assurance of juror unanimity as to the assault conviction.  While it is of course possible that the jurors agreed unanimously as to a particular victim of the assault, such agreement would necessarily be fortuitous in the absence of a proper instruction."].)  In effect, that was the situation here. Only one conviction was legally permissible and there were two potential victims.

In this regard, respondent proffers an exception to the unanimity requirement. Respondent contends unanimity was not required under the facts of this case because Milam's defense was the same for both counts of attempted murder. (See *People v. Jennings* (2010) 50 Cal.4th 616, 679.) Respondent characterizes Milam's defense as: "[H]e did not intend to kill either Detective Gutierrez or Detective Thrash but only intended to escape." The reason no unanimity instruction is required when the defendant presents the same defense to multiple acts is that the jury will accept or reject the defense for all charges.

Milam certainly argued that he did not intend to kill anyone, and he did not fire his gun at the detectives. The jury did not accept this defense.

However, this was not Milam's sole or complete defense. The prosecutor's theory was that pointing a gun at someone showed intent to kill. Milam also argued, less directly and as an alternative defense, that he could, at most, have intended to kill only one of the detectives with his one shot, since the detectives were not next to each other. He also noted the two detectives gave inconsistent accounts of where his gun was pointed. Resolution of where the gun was pointed was not dependent on Milam's credibility. Thus, the jury could accept or reject the defense as to all charges whether or not it believed Milam. The same defense exception to the unanimity requirement does not apply.

D.  *The Chapman Standard of Review Applies.*

Milam contends the failure to give a unanimity instruction is reviewed under *Chapman*. We agree. As Milam notes, most appellate courts in California have assessed unanimity error under *Chapman*. (See *People v. Hernandez* (2013)

15

217 Cal.App.4th 559, 576, and cases cited therein.) A minority applies the *Watson* standard, based on the fact that the U.S. Supreme Court had " 'never held jury unanimity to be a requisite of due process.' " (*People v. Vargas* (2001) 91 Cal.App.4th 506, 562.) That is no longer true. (*Ramos v. Louisiana* (2020) ___U.S. ___ [140 S.Ct. 1390, 1397] [Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally].) *Chapman* should now control.

We would reach the same conclusion concerning the standard of review if we applied the two-step analysis in *Canizales*. In the first step, the court determines if there is a reasonable likelihood that "the jury understood the kill zone theory in a legally impermissible manner." (*Canizales*, *supra*, 7 Cal.5th at p. 613, citing *People v. Kelly* (1992) 1 Cal.4th 495, 525, quoting *Estelle v. McGuire* (1991) 502 U.S. 62, 72.) The court considers the arguments of counsel and other relevant instructions to determine whether the jury understood the law in a legally impermissible way. In step two, if the court determines if there is a reasonable likelihood that the jury understood the kill zone theory in a legally impermissible way, then the case is "similar to *People v. Green* (1980) 27 Cal.3d 1," a case where the jury might have based its verdict on either a legally correct or a legally incorrect theory. (*Canizales,* at p. 614.) As the California Supreme Court subsequently clarified, such "alternative-theory error is subject to the more general *Chapman* harmless error test. The reviewing court must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 13 (*Aledamat*) [disapproving any

16

interpretation of *Green* that "limits the reviewing court to an examination of the jury's findings as reflected in the verdict itself".].)  If the instruction is simply factually erroneous, that is unsupported by the evidence, it is reviewed pursuant to *Watson*. (*Canizales*, at pp. 612–613.)

    1.    *Step One*

Respondent contends the question is whether, considering the instruction and the arguments of counsel, there was a reasonable likelihood the jurors understood or applied the kill zone theory in a legally impermissible way—which means whether they could have convicted petitioner of attempted murder of Gutierrez without a specific intent to kill him under the theory that he was the unintended victim in the kill zone of Thrash.[6]

We view the step one question more broadly.  A kill zone instruction should only be given when the evidence supports more than one count of attempted murder for a single incident. The instruction is unnecessary when the evidence supports only one count of attempted murder.  As the district attorney acknowledged for the People in the superior court, "the facts of Petitioner's case (one single shot fired at two victims) no longer justifies the trial court's kill zone theory instruction after *Canizales*."  Thus, the question before us is whether there is a reasonable likelihood the jury understood the instruction as

_____

[6]    The question at the first step is only how the jury understood the theory as set forth in instructions and argument: "we must ask whether there is a ' " reasonable likelihood" ' that the jury understood the kill zone theory in a legally impermissible manner."  (*Canizales*, *supra*, 7 Cal.5th at p. 613.) We consider the issue of "applied" in step two.

17

permitting it to convict Milam of two counts of attempted murder on the legally impermissible theory that firing a single shot at one victim could support two attempted murder convictions. We think the answer is yes.

As might be expected from its title, "Attempted Murder-Concurrent Intent," the kill zone instruction in this case focused on the defendant's intent, not his actions. The instruction stated: "A person who primarily *intends* to kill one person, may also concurrently *intend* to kill other persons within a particular zone of risk. This zone of risk is termed the 'kill zone.' The *intent* is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator *intended* to ensure harm to the primary victim by harming everyone in that victim's vicinity. [¶] Whether a perpetrator actually *intended* to kill the victim, either as a primary target or as someone within a 'kill zone' is an issue to be decided by you." (Italics added.) As a result, the instruction suggests that it is intent which matters and that an attack on the primary victim may itself be sufficient to show an intent to kill others in the kill zone, without making clear that such inference would not be reasonable without an accompanying act. Put differently, the instruction does not convey that it is unreasonable to infer that a defendant intended to kill someone in addition to the primary target unless he fired more than one shot.

The People only aggravated the potential for misunderstanding when the prosecutor discussed the instruction during rebuttal closing argument. The prosecutor noted defense counsel "brought up[] why did he only fire one shot" if he intended to kill two people. The prosecutor referred the jury to

18

CALJIC No. 8.66.1, telling the jury that the instruction "talks about something called the kill zone. [¶] It says, a person who primarily intends to kill one person may also concurrently intend to kill other persons within a particular zone of risk. The law specifically addresses what counsel got up here and said to you, how could he intend to kill both officers if he only shot once. [¶] Well, it's called the kill zone. If I intend to kill, if one of you wants to kill me and shot toward me, and the court reporter is standing behind me, you know you will hit her if you miss me, but you do it anyways. That's what this addresses. [¶] You can intend to kill two people with one shot if you're standing in the same kill zone; if they are standing in the same area."[7]

That is *not* what the kill zone theory is intended to address. The prosecutor's suggestion that one shot and one intent to kill could support two attempted murder convictions if the defendant had bad aim and missed the primary target is a bizarre amalgam of conscious disregard for life/implied malice and transferred intent. Neither doctrine may be used in attempted murder cases at all. (*Bland*, *supra*, 28 Cal.4th at pp. 326–328; *Canizales*, *supra*, 7 Cal.5th at p. 607 [kill zone theory re-affirms the law's long-standing rejection of those doctrines and requires that the defendant specifically intend to kill everyone in the kill zone].) Thus, there is a reasonable likelihood that the jury understood the instruction and argument together to permit them to convict

---

[7]     This argument is remarkably similar to the misleading argument in *Canizales* which, as the Court noted, "essentially equated attempted murder with implied malice murder" or advanced a sort of natural and probable consequences argument that "anyone within a zone of harm could die." (*Canizales*, *supra*, 7 Cal.5th at p. 614.)

19

Milam of the attempted murders of Thrash and Gutierrez even though Milam had the specific intent to kill only one of the detectives.

### 2. *Step Two*

Because we have determined that there is a reasonable likelihood the jury understood the kill zone theory in a legally impermissible way, we examine the entire cause, including the evidence, and considering all relevant circumstances, to determine whether the error was harmless beyond a reasonable doubt." (*Aledamat*, *supra*, 8 Cal.5th at p. 13.) We cannot find the error harmless beyond a reasonable doubt, and we must reverse. (*Ibid*.)[8]

Here, we consider respondent's argument that the prosecutor "emphasized" that Gutierrez was the primary victim and Thrash the unintended kill zone victim[9] and that the

---

[8] Under *Watson*, the giving of the erroneous instruction would be prejudicial " 'only if that theory became the sole basis of the verdict of guilty; if the jury based its verdict on the valid ground, or on both the valid and the invalid ground, there would be no prejudice, for there would be a valid basis for the verdict.' " (*Canizales*, *supra*, 7 Cal.5th at pp. 612–613.) Because respondent contends that the *Watson* standard applies, respondent argues that it is not reasonably probable that the jury convicted Milam of the attempted murder of Gutierrez on the sole theory that Gutierrez was the kill zone victim. We have determined that the applicable standard is *Chapman*, however, and that requires a different analysis.

[9] Respondent suggests that this argument constituted an election for purposes of unanimity. Such an election must be clear, and as we discuss in more detail below, this was not.

evidence at trial supported this theory and did not support a theory that Thrash was the primary target. We do not agree.

In the initial closing argument, the prosecutor did not distinguish between the two detectives. He repeatedly used the plural pronoun "them" and otherwise referred to them collectively. The prosecutor argued: "Gutierrez and Thrash remembered it differently. If you recall, there was a lot of cross-examination on that. [¶] Recall that the defendant was facing him in the process of turning when he raised his arm almost level but not all [the] way up and fired the shot and saw a muzzle flash. [¶] Detective Thrash recalled the defendant's body being turned away when defendant raised his arm, again, not all the way up but raised it almost level firing the shot. Detective Thrash was in front of and little bit offset from Detective Gutierrez. [¶] Again, when the defendant pointed his gun and fired that shot, there's no way he had any intent to do anything other than kill *them*." (Italics added.)

The prosecutor briefly returned to Milam's previous encounter with two other police officers, noting Milam put his gun away after that encounter but when Milam encountered Thrash and Gutierrez, "[h]e pulls his gun out to shoot again. [¶] That is great evidence to show what was in his mind at that time. His mind was that, I'll pull my gun back out and I'll shoot *at more cops* and hopefully hit *one of them* so I can get free and get out of here. He pulls his gun out and fires yet another shot *at two police officers*, Detective Gutierrez and Thrash." (Italics added.)

In going through the elements of attempted murder, the prosecutor argued: "Raising your gun and shooting at someone, clearly shows intent to kill." He continued: "After putting his gun away, he pulled it out and shot again at Officer Gutierrez *and*

21

Thrash.  So that's all willful means."  (Italics added.)  The prosecutor then stated: "At that moment he's thinking, I better pull my gun out again so I can shoot *officers* again.  That's deliberation."  (Italics added.)

Nowhere in this discussion did the prosecutor suggest Milam "directly" intended to kill Gutierrez as opposed to Thrash.  The prosecutor did not discuss the kill zone theory at all in the initial closing argument.

In rebuttal closing argument, the prosecutor noted defense counsel "brought up, why did [Milam] only fire one shot."  As discussed above in more detail, the prosecutor responded by discussing CALJIC No. 8.66, telling the jury that instruction "talks about something called the kill zone.  [¶] . . . [¶]  . . . That's what this addresses."

Then, for the first time, the prosecutor addressed the concept of a primary target, explaining the instruction says "whether a perpetrator actually intended to kill the victim either as a primary target or as someone in a kill zone is an issue to be decided by you.  So it's up to you."  The prosecutor then asked: "Was Detective Thrash in an area where defendant would know he was there, and in firing, was Detective Thrash in the kill zone of Detective Gutierrez?"  The prosecutor then argued Thrash had testified that he was between Gutierrez and the defendant when defendant fired the shot.  The prosecutor also argued "Detective Thrash believed the shot was fired at him."  Given the prosecutor's repeated assertions that pointing a gun at a person showed an intent to kill the person, this statement about Thrash suggested Milam could have intended to kill Thrash as the primary target.

At no point did the prosecutor suggest that if the jury found the kill zone theory inapplicable, it should convict Milam of the attempted murder of Gutierrez alone because Milam "directly" intended to directly kill Gutierrez with his one shot. The prosecutor made clear his belief that there was a primary target, but it was up to the jury to decide who Milam's primary target was. That person was necessarily the one whom Milam "directly" intended to kill. At no point did the prosecutor or the instructions tell the jury it needed to agree on which detective was the primary target.

Later, reviewing the evidentiary record of the trial, the superior court found the evidence was clear Milam was shooting at Gutierrez as the primary target and Thrash was "around the corner" and was a kill zone victim. The court was mistaken. Gutierrez was behind the police car. Both Gutierrez and Thrash placed Thrash in the open and near Gutierrez, but closer to Milam than Gutierrez was.[10] This was in fact the only key point on which the two detectives agreed and it alone would make Thrash the obvious primary target for Milam.

---

[10] Thrash testified that he was on the sidewalk about 20 feet from Milam when Milam fired his gun. Gutierrez and the police car were 20 feet behind Thrash, placing Thrash midway between Milam and Gutierrez. Gutierrez testified he was behind the police car when Milam fired. He agreed that Thrash was between him and Milam, although he estimated that Thrash was three feet in front of him and three feet to the right. Given Gutierrez's self-described position behind the left rear panel of the car (i.e., the trunk on the driver's side), Thrash could not have been behind the car. Gutierrez estimated that Milam was about 30 feet in front of him.

Thrash also testified he briefly pursued Milam on foot, as Milam ran away from the building walkway and then turned around and ran back toward the walkway. Thrash was initially in the street, with parked cars between himself and Milam. Once Milam turned around, Thrash "cleared" the cars and went onto the sidewalk or grass verge, in anticipation that Milam was planning to run back into the walkway.[11] This fact alone would also make Thrash the obvious primary target for Milam.

The prosecutor and the trial court appear to have viewed Gutierrez as the more likely primary target because he testified Milam was running toward him, raised his arm with the gun almost completely level and pointed it "directly" at Gutierrez. Given the detectives' locations, however, running toward Gutierrez was necessarily also running toward Thrash and pointing a gun "at" Gutierrez from a distance of 20 to 40 feet would almost certainly be indistinguishable from pointing the gun "at" Thrash. Thus, nothing in Gutierrez's description of events ruled out Thrash as the primary target.

Thrash's testimony about the shooting itself was more equivocal than Gutierrez's testimony. Thrash described Milam as firing over his shoulder with his arm not fully extended. Thrash stated he saw Milam raise the gun "partially; not completely level to where I was standing or my partner was

---

[11] Gutierrez was not questioned about Thrash's movements, although Gutierrez indicated he saw Milam running toward him as soon as he got out of the police car, which, depending on how fast Gutierrez exited the car, might indirectly contradict Thrash's account of a chase. Thrash, however, described the chase as lasting only seconds.

standing and to fire a gunshot." [12]  Thrash stated: "I [then] turned and made a step to my right, which would have put the corner of the building between the suspect and myself."  Nonetheless, Thrash's testimony as a whole indicated he believed Milam was firing toward him.

There was one other notable discrepancy in the detectives' testimony.  Gutierrez testified both he and Thrash took their guns out as soon as they got out of their car.  Thrash testified he did not take out his gun because he did not see that Milam had a gun until Thrash "cleared" the cars; by then he did not have time to pull his gun.  According to Thrash, Milam fired first.  According to Gutierrez, Milam fired after Gutierrez finished firing.  If Gutierrez alone had his gun out and *if* Milam was aware of this, or if Gutierrez fired first, then either of those facts would make Gutierrez the obvious primary target.

As we discuss above, the jury was not instructed that it had to agree unanimously on the identity of the primary target, and the prosecution did not convey this requirement to the jury or make an election as to the identity of the primary target which

---

[12]    Thrash physically recreated this movement during cross-examination, but the description provided by defense counsel is not helpful: "The gentleman is facing away.  His right arm is being held out; elbow is pointed away.  His hand is about 30 degrees.  Arm is 30 degrees extended."  Milam views this description as indicating that the gun was pointing downward toward the ground and so did not evidence an intent to kill.  It is possible to understand this description as indicating that the gun was pointing down at a 30 degree angle, but given that Milam was reaching behind his back to fire, it is also possible to understand it as referring to the way Milam bent his hand and arm in order to be able to fire behind himself.

25

would have vitiated the need for a unanimity instruction. Given the conflicting evidence described above, there is a reasonable possibility that at least one juror believed Thrash was the primary target whom Milam directly intended to kill, or put differently, it is not clear beyond a reasonable doubt that all 12 jurors agreed Gutierrez was the primary target whom Milam "directly" intended to kill. We cannot say beyond a reasonable doubt that a properly instructed jury would have reached the same verdict as to the attempted murder of Gutierrez. Indeed there is a reasonable possibility that a jury, properly instructed to determine which detective Milam wanted to kill, would look at the conflicting evidence and be unable to agree on the target, or would conclude that the evidence did not prove Milam intended to kill either detective.

Although reversal of the attempted murder conviction involving Gutierrez is required, there is sufficient evidence to support a conviction for the attempted murder of Gutierrez, and so retrial is permissible. We find such a retrial would not merely be a formality to obtain the same result. Milam fired his single shot at moving officers while he himself was moving, he did not hit either officer, and he fled without firing further shots. As we have explained, it is reasonably possible that a properly instructed jury, if forced to decide which detective Milam intended to kill, might find the circumstances of Milam's single shot do not support an inference to kill either detective. More pertinently, they might not be able to agree unanimously that Milam intended to kill Gutierrez.

## DISPOSITION

The petition for writ of habeas corpus is granted. The judgment of conviction is reversed. The matter is remanded to the trial court for retrial on the attempted murder count as to Gutierrez, if the People so elect.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, P. J.

We concur:

GRIMES, J.

WILEY, J.